UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

UNITED STATES OF AMERICA

<div style="float:right">

FILED
CLERK

2:38 pm, Jun 04, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM & ORDER**
19-CR-00537 (JMA) (SIL)

</div>

              -against-

ANDREW FREY,

                           Defendant.
---------------------------------------------------------------------X

**AZRACK, United States District Judge:**

After a trial that spanned nearly two weeks, a jury convicted Defendant Andrew Frey ("Frey") of two counts of Attempted Kidnapping and two counts of Attempted Sex Trafficking. Presently before the Court is Frey's motion for acquittal under Federal Rule of Criminal Procedure ("Rule") 29 or for a new trial under Rule 33.  (ECF No. 156.)  For the reasons set forth below, the motion is DENIED.

## I.      BACKGROUND

### A.    **The Charges**

Frey was charged with six-counts in a Superseding Indictment.  (ECF No. 79.)  Counts I and II charged Frey with Attempted Sex Trafficking, in violation of 18 U.S.C. § 1591(a)(l), and Attempted Kidnapping, in violation of 18 U.S.C. § 1201(a)(1), of Danielle (identified in the Superseding Indictment as Jane Doe #1) in or about October 2018.  (Id.)  Counts III and IV charged Frey with Attempted Sex Trafficking and Attempted Kidnapping, in violation of the same provisions of the United States Code, of Desira (identified in the Superseding Indictment as Jane Doe #2) in or about July 2019.  (Id.)  Count V charged Frey with being a Felon in Possession of a Firearm in or about and between March 2018 and June 2020, in violation of 18 U.S.C. §§ 922(g)(l) and 924(a)(2).  (Id.)  Count VI charged Frey with Obstruction of Justice in or about and between July 2019 and April 2022, in violation of 18 U.S.C. § 1512(c)(2).  (Id.)

B.   **The Trial**

Trial commenced on September 8, 2022, and concluded on September 20, 2022, with a jury verdict that found Frey guilty on Counts I-IV of the Superseding Indictment.[1]  (See ECF Nos. 124, 137.)  The following facts were established at trial.

### 1.   **Offense Conduct Regarding Danielle**

Danielle and Frey first met in the summer of 2018, when Frey solicited Danielle for commercial sex as Danielle was walking on Montauk Highway in Mastic, New York.  (Tr.[2] 118-19, 188.)  At that time, Danielle was homeless, had a history of bipolar disorder, and was battling a decade-long heroin addiction.  (Tr. 113-16, 202.)  She slept primarily at the Shirley-Mastic train station and earned money to support her heroin addiction through sex work.  (Tr. 114-16.)  Danielle used heroin "every day, if possible."  (Tr. 113; see Tr. 120, 193.)

Following their initial encounter, Frey solicited Danielle for commercial sex several times.  (Tr 119-20.)   Each of these meetings was arranged through cell phone communications and occurred inside Frey's 2011 Jeep Grand Cherokee ("Jeep").  (Tr. 119-20, 130, 190-92, 215-16, 247-48.)  For one encounter, Frey took Danielle from the Shirley-Mastic train station to a secluded location at a Long Island beach called Smith Point.  (Tr. 122-23, 219-21.)  That drive took approximately twenty minutes.  (Tr. 122, 219-21.)  As Frey drove farther onto the beach trails, Danielle became "very scared" because she was with Frey in a "very secluded," unfamiliar, and dark grassy area while Frey, who had previously been "upbeat, chipper, [and] pleasant," acted "standoffish" and "took total control of everything."  (Tr. 122-24.)  Frey videotaped the sexual encounter with Danielle at the beach despite Danielle's objections and requests for Frey to stop

---

[1]       The Court previously granted Frey's motion for a separate trial on Counts V and VI of the Superseding Indictment.  (ECF No. 88.)  The Court later accepted Frey's guilty plea for those charges.  (ECF No. 147).

[2]       Citations to "Tr." refer to the corresponding pages of the trial transcript.

recording.  (Tr. 124-25, 227.)  Frey's demeanor softened only when another vehicle passed by; he then became "withdrawn."  (Tr. 126.)  After that experience, Danielle wanted to never see Frey again.  (Tr. 126-28.)

In early October 2018, because she needed money to buy heroin and quell withdrawal symptoms, Danielle contacted Frey via text message and agreed to have commercial sex with him on the condition that he not take her to the beach.  (Tr. 128-30, 190, 248.)  Frey agreed to this condition and drove to meet Danielle at the Shirley-Mastic train station.  (Tr. 130-31.)  Once Danielle got into the Jeep, Frey handed Danielle $50 for sex, began to drive, and informed her that they were going to the beach.  (Tr. 131, 249, 300.)  Danielle refused to go to the beach and reminded Frey that he agreed to not go there.  (Tr. 131, 249.)  Frey then screamed at Danielle and threatened to kill her.  (Tr. 131-32.)  Danielle requested to be let out of the Jeep, but Frey locked the doors and grabbed her; the two struggled while Frey was "driving faster and faster."  (Tr. 131-33, 249-50.)  Danielle escaped by jumping out of the Jeep—while Frey was still driving.  (Tr. 133.)  Frey drove away as Danielle laid in the street.  (Tr. 133-35, 261.)

Shortly after Frey departed, Danielle asked a nearby stranger to drive her to the Shirley-Mastic train station; that stranger kindly agreed.  (Tr. 135, 261.)  After she was dropped off at the train station, Danielle met her friend William Mitchell ("Mitchell"), who typically slept in his car at the train station parking lot.  (Tr. 116, 136, 319-20.)  Danielle told Mitchell what happened, and Mitchell photographed Danielle's injuries.  (Tr. 137, 322-26.)  Danielle stayed with Mitchell in his vehicle that night.  (Tr. 322.)

The next day, while Danielle was asleep, Frey approached Mitchell's vehicle, banged on the window, and tried to pry open the door.  (Tr. 139, 322-23.)  Despite the approximately eighty-degree heat, Frey was wearing a black jacket with the collar zipped up over his face, a hat, and

3

black leather gloves.  (Tr. 139, 323.)  Frey was also carrying a large knife.  (Tr. 323.)  Mitchell frantically drove himself and Danielle away, but Frey chased them with the Jeep.  (Tr. 140-42, 324.)  When Frey chased them, Danielle and Mitchell noticed that the Jeep lacked a license plate. (Tr. 140-42, 324; see also Tr. 511 (testimony from Frey's daughter confirming that the Jeep had a push-button apparatus to conceal its license plates).)  Ultimately, Danielle and Mitchell managed to get away from Frey.  (Tr. 142, 324.)

### 2.  Offense Conduct Regarding Desira

Desira and Frey first met around April 2019 outside of a deli in Coram, New York, when Frey solicited and paid Desira—then a sex worker for many years—to "talk." (Tr. 387-90.)  Desira and Frey later communicated through text messages.  (Tr. 390-92.)  They met a few times for commercial sex in the Jeep, but Desira later became uncomfortable around Frey and decided to not see him again.  (Tr. 392-93.)  For some time thereafter, Desira ignored Frey's text messages. (Tr. 393.)

In July 2019, however, Desira accepted Frey's offer via text message to pay $300 for sex. (Tr. 393-94.)  For that encounter, Desira and Frey met at the same deli in Coram.  (Tr. 394.)  Frey paid Desira $300 when she entered the Jeep.  (Tr. 394, 476-77.)  As Frey drove toward a wooded area, Desira became nervous and asked Frey to let her out of the Jeep.  (Tr. 395.)  Frey refused to do so, and instead screamed, "No, I own you."  (Tr. 395-96.)  Desira—who had previously observed that Frey kept a firearm in the Jeep's driver-side door—feared that Frey might hurt or kill her.  (Tr. 393, 396-97.)  Desira tried to exit the Jeep.  (Tr. 396.)  Frey then drove faster, locked the doors, and grabbed Desira.  (Tr. 396-97, 499.)  After a short physical struggle, Desira escaped by jumping out of the Jeep while Frey was still driving.  (Tr. 397, 500.)

Desira refused to communicate with Frey after this incident.  (Tr. 399.)  Frey, however, repeatedly attempted to contact her.  (See Tr. 399 (Desira's testimony that Frey repeatedly tried to contact her); Tr. 358 (testimony from T-Mobile records custodian describing Frey's calls to Desira's phone and that several such calls were made by Frey blocking his phone number).)  Desira also observed Frey drive by her house—even though she never gave him her address.  (Tr. 399-400.)  Law enforcement later discovered that Frey's phone contained Desira's address, as well as her vehicle's license plate and vehicle identification numbers.  (Tr. 551-53.)

### 3.    Items Observed in and Recovered from the Jeep

On October 4, 2018, shortly after the incident with Danielle, Frey was involved in an incident in Coram, New York.[3]  (Tr. 363-65.)  Responding Suffolk County Police Officer Peter Alvarez observed a pair of handcuffs inside the Jeep.  (Tr. 365.)  Officer Alvarez also confirmed that the Jeep's front license plate at that time was loosely placed behind the windshield instead of properly fixed to the front bumper.  (Tr. 366-70.)

Following Frey's arrest for this case, the Federal Bureau of Investigation ("FBI") searched the Jeep on November 18, 2019.  (Tr. 50.)  The FBI recovered from the Jeep's cabin handcuffs, handcuff keys, black gloves with reinforced knuckles, black gloves without reinforced knuckles, a rope attached to a carabiner, and a knife "that flips open" with an accompanying sheath labeled "Frey."  (Tr. 57-69, 79-80; see also Tr. 507-08 (testimony from Frey's daughter that Frey did not work in law enforcement or security).)  The FBI recovered from the trunk a large "machete style knife" and a "manmade collar leash device" with "jagged triangles."  (Tr. 69-73.)  Finally, the FBI

---

[3]    The substance of the incident was not discussed at trial.  (See Tr. 363 (soliciting testimony about Officer Alvarez's observations of Frey and the Jeep "without telling us why you responded to" their location).)

extracted a license plate concealing apparatus that operated from a remote near the driver's seat. (Tr. 73-79.)

## II.    LEGAL STANDARDS

### A.    Rule 29

Rule 29 provides that after the close of the government's evidence in a criminal trial, and on the defendant's motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a).  As explained below, "[a] defendant challenging the sufficiency of the evidence 'bears a heavy burden,' and 'the standard of review is exceedingly deferential.'"  United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).

"Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt' may the court enter a judgment of acquittal."  United States v. Jabar, 19 F.4th 66, 76 (2d Cir. 2021) (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)), cert. denied sub nom. Bowers v. United States, 142 S. Ct. 1396 (2022).  The Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  Id. (quoting Martoma, 894 F.3d at 72); see United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (similar).  "As long as the evidence 'would suffice to convince any rational trier of fact that the crime charged has been proven beyond a reasonable doubt, then the conviction must stand.'"  Jabar, 19 F.4th at 76 (quoting United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994)); see White, 7 F.4th at 98 (similar).  The evidence must be evaluated "in conjunction" rather

than by "piecemeal or in isolation." <u>United States v. Klein</u>, 913 F.3d 73, 78 (2d Cir. 2019); <u>see also</u> <u>Guadagna</u>, 183 F.3d at 130 (noting that "each fact may gain color from others").

In that analysis, "the court must be careful not to usurp the role of the jury." <u>Jabar</u>, 19 F.4th at 76. "'Rule 29 does not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury.' Thus, where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'" <u>Id.</u> (quoting <u>Guadagna</u>, 183 F.3d at 129) (internal alterations omitted).

## B.   <u>Rule 33</u>

Under Rule 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Rule 33 motions are 'granted only in extraordinary circumstances, and are committed to the trial court's discretion.'" <u>United States v. Escalera</u>, 957 F.3d 122, 137 (2d Cir. 2020) (quoting <u>United States v. Torres</u>, 128 F.3d 38, 48 (2d Cir. 1997)); <u>see</u> <u>United States v. Landesman</u>, 17 F.4th 298, 330 (2d Cir. 2021) (similar). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" <u>United States v. Alston</u>, 899 F.3d 135, 146 (2d Cir. 2018) (quoting <u>United States v. Aguiar</u>, 737 F.3d 251, 264 (2d Cir. 2013)); <u>see</u> <u>United States v. McPartland</u>, 81 F.4th 101, 123 (2d Cir. 2023) (similar). In doing so, the Court must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." <u>United States v. Peters</u>, 843 F. App'x 369, 374 (2d Cir. 2021) (quoting <u>United States v. Ferguson</u>, 246 F.3d 129, 133 (2d Cir. 2001)) (internal alterations omitted). For that reason, "[a] district court may not grant a Rule 33 motion based on the weight of the

evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." Landesman, 17 F.4th at 330 (quoting United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020)).  Ultimately, under Rule 33, "'[t]he defendant bears the burden of proving that he is entitled to a new trial,' and in order to grant a new trial, 'a district court must find that there is a real concern that an innocent person may have been convicted.'"  United States v. Hunter, 32 F.4th 22, 30 (2d Cir. 2022) (quoting United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009)); see McPartland, 81 F.4th at 123 (similar).

### III.    DISCUSSION

Frey advances several arguments under Rule 29 for acquittal and, alternatively, several arguments under Rule 33 for a new trial.  (See generally ECF No. 156-1 (original motion); ECF No. 162 (supplemental motion).)  These arguments are addressed in turn.

### A.    The Evidence Showed that Frey Acted with the Requisite Intent for the Attempted Sex Trafficking Convictions

Frey's Attempted Sex Trafficking convictions require proof that he (among other things) knew or was reckless to the fact that force, threats of force, fraud, or coercion would be used to cause Danielle and Desira to engage in a commercial sex act.  See 18 U.S.C. § 1591(a)(1).  Frey propounds multiple arguments asserting the government produced insufficient evidence at trial to show that intent.  (See ECF No. 156-1 at 2, 9-14.)  None persuade.

The Court first addresses the Sex Trafficking statute's knowledge requirement.  Force, threats of force, and fraud are undefined in § 1591 and therefore are construed to accord with their "ordinary or natural meaning[s]."  Lozano v. Alvarez, 697 F.3d 41, 56 (2d Cir. 2012) (quoting Smith v. United States, 508 U.S. 223, 228 (1993)), aff'd 572 U.S. 1 (2014).  Thus, "force" means "the exertion of strength or energy."  Ardolf v. Weber, 332 F.R.D. 467, 476-77 (S.D.N.Y. 2019) (internal quotation marks omitted).  "Fraud" means "a knowing misrepresentation of a material

fact made to induce another to act to his or her detriment." Id. at 475-76 (internal quotation marks omitted).  The statute defines "coercion" to include conduct "intended to cause a person to believe that failure to perform an act would result in . . . physical restraint."  § 1591(e)(2)(B).  The statute defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."  § 1591(e)(3).

According to Frey, "[t]here was no testimony or other evidence" that he acted with the requisite intent.  (ECF No. 156-1 at 11; see id. at 14 (similar).)  But ample evidence supports the jury's verdict.  Danielle and Desira testified about Frey's history of commercial sex with them, his agreements to meet them on the subject occasions for commercial sex, and his immediate payments on the subject occasions for commercial sex.  (Tr. 119-22, 128-31, 190-92, 215-16, 248, 300, 392-94, 476-77.)  Danielle further testified that, once she entered the Jeep, Frey broke his promise to not take her to the beach for sex.  (Tr. 128-31, 190, 248-49.)  And critically, both women explained that Frey threatened them and acted to force them to remain in the Jeep once they objected to Frey's efforts to take them to the respective secluded locations for sex.  (Tr. 131-33, 249-50, 395-97, 499.[4])  Thus, the evidence viewed in a light most favorable to the government established Frey's intent to use force, threats of force, fraud (against Danielle only), and coercion to make those women engage in commercial sex.[5]  See Martoma, 894 F.3d at 76 (acknowledging that criminal intent is "generally proved with circumstantial evidence"); United States v. Heras,

---

[4]      Viewed most favorably to the government, that testimonial evidence would, alone, be sufficient to uphold the Attempted Sex Trafficking convictions even absent the additional incriminating evidence regarding the materials recovered from the Jeep.  See infra Section III.D.3.

[5]      A defendant's behavior is coercive when it fits within the definition of § 1591(e)(2) and is "sufficiently serious to cause both the victim and reasonable people of the same background and in the same circumstances to feel coerced."  United States v. Purcell, 967 F.3d 159, 192 (2d Cir. 2020) (internal quotations marks and brackets omitted).  Viewing the evidence in the light most favorable to the government, Frey coerced Danielle and Desira under that standard.

609 F.3d 101, 106 (2d Cir. 2010) (similar); David v. Weinstein Co. LLC, 431 F. Supp. 3d 290, 301 (S.D.N.Y. 2019) (holding that false promises used to obtain commercial sex constitute fraud, and gripping and pulling to obtain commercial sex constitute force); Ardolf, 332 F.R.D. at 475-77 (similar).

Relatedly, Frey argues that Danielle's and Desira's reported fear that he might kill them means the evidence showed that Frey intended to kill, not obtain commercial sex.  (See ECF No. 156-1 at 11-14.)  The Court agrees with the government that Frey's "argument conflates his intent with Danielle's and Desira's fear." (ECF No. 160 at 13.)  That Danielle and Desira feared Frey might ultimately kill them does not alter that, as just explained, the evidence viewed in a light most favorable to the government established Frey's intent to use force, threats of force, fraud, and coercion to make those women engage in commercial sex.

Finally, Frey contends that he could not have used a proscribed method to obtain commercial sex because Danielle and Desira consented to it as prostitutes.  (See ECF No. 156-1 at 10, 12.)  But a Sex Trafficking conviction is appropriate when the defendant uses force, threats of force, fraud, or coercion "in an effort to overcome" a prostitute's withdrawal of consent to commercial sex because she objects to "the proposed site" for it.  United States v. Frey, No. 19-CR-537, 2021 WL 215722, at *2 (E.D.N.Y. Jan. 21, 2021) (Hurley, J.); see United States v. McKinley, 647 F. App'x 957, 961 (11th Cir. 2016) (per curiam) (sustaining Sex Trafficking conviction where evidence showed the defendant used force, threats of force, and coercion to extend a prostitute's participation in commercial sex).  Indeed, Danielle's and Desira's initial consent to commercial sex "does not mean that the[y] . . . therefore consented to being threatened or coerced into performing sexual acts they did not wish to perform" at the beach or in the woods. United States v. Rivera, 799 F.3d 180, 185 (2d Cir. 2015); accord United States v. Maynes, 880

F.3d 110, 115 (4th Cir. 2018) (concluding that prostitution histories do not undermine the use of force, threats of force, fraud, or coercion at issue in Sex Trafficking charges); United States v. Gemma, 818 F.3d 23, 34 (1st Cir. 2016) (similar); United States v. Roy, 781 F.3d 416, 420-21 (8th Cir. 2015) (similar); United States v. Cephus, 684 F.3d 703, 708 (7th Cir. 2012) (similar); see also United States v. Raniere, 55 F.4th 354, 366 (2d Cir. 2022) (recognizing that Sex Trafficking encompasses acts that compel a person "to perform or to continue performing commercial sexual activity" (quoting § 1591(e)(5)) (emphasis added)).

**B.     The Evidence Showed that Frey Intended to Hold his Victims For a Period Sufficient to Support the Attempted Kidnapping Convictions**

Frey argues that he must be acquitted of the Attempted Kidnapping convictions given the Second Circuit's decision in United States v. Krivoi, 80 F.4th 142 (2d Cir. 2023), which was issued after Frey's trial and narrowed the second element of Kidnapping.[6] (See ECF Nos. 162; 170.)  In Krivoi, the Second Circuit deemed "significant" the Third Circuit's recognition of "'the inequity inherent in permitting kidnapping prosecutions of those who in reality committed lesser or different offenses, of which temporary seizure or detention played an incidental part.'"  Id. at 151, 153 (quoting Gov't of V.I. v. Berry, 604 F.2d 221, 226 (3d Cir. 1979)).  Consequently, the Second Circuit "adopt[ed] a narrowing gloss on the current kidnapping statute . . . ."  Krivoi, 80 F.4th at 153.  Under that new standard, "[w]hen a defendant is charged with both kidnapping and another offense, the defendant's conduct satisfies section 1201(a)'s second element . . . only if the defendant held the victim for a period that was appreciably longer than the time required to commit

---

[6]     Three elements constitute Kidnapping under 18 U.S.C. § 1201(a)(1): "(1) the victim must be unlawfully taken, coerced, or deceived into accompanying the accused nonconsensually, (2) the victim must be held by the accused for ransom, reward or otherwise, and (3) there must be an interstate or foreign commerce nexus."  Krivoi, 80 F.4th at 149 (internal quotation marks and citations omitted).

the other offense."[7]  Id.; accord United States v. Murphy, __ F.4th __, No. 22-7021, 2024 WL 2003307, at *12 (10th Cir. May 7, 2024).

Even evaluated under the standard adopted in Krivoi, the trial evidence supported Frey's Attempted Kidnapping convictions.  To prove the Attempted Kidnappings, the government was required to show Frey "intended to commit each of the essential elements of" and took a "substantial step toward" each kidnapping.  Collier v. United States, 989 F.3d 212, 221 (2d Cir. 2021) (internal quotation marks omitted); see, e.g., United States v. Pugh, 945 F.3d 9, 20 (2d Cir. 2019); United States v. Farhane, 634 F.3d 127, 145 (2d Cir. 2011); accord United States v. Sanchez, 615 F.3d 836, 842-44 (7th Cir. 2010) (applying this principle to an Attempted Kidnapping conviction).  Under Krivoi, the second element of Kidnapping "contains two implicit requirements."  80 F.4th at 154.  "First, as is the case in all federal kidnapping prosecutions, a defendant may be convicted of kidnapping and a separate offense only if the victim was held for an appreciable period."  Id.  "Second, that period must itself be appreciably longer than the time the defendant needed to commit only the other crime or crimes with which he or she has been charged."  Id.  Thus, the Attempted Kidnapping convictions require proof of "the duration of the *planned* detention or asportation."  United States v. Howard, 918 F.2d 1529, 1536 (11th Cir. 1990); accord United States v. Ferguson, 65 F.4th 806, 814-15 (6th Cir. 2023).  Each of Frey's arguments is addressed below with respect to the relevant portion of that analysis.[8]

---

[7]     That new standard is "similar in key respects to" the Third Circuit's relevant test but is "simplified and easier to apply."  Krivoi, 80 F.4th at 153.  In the Third Circuit, four factors determine whether a detention or asportation was sufficiently appreciable to constitute a kidnapping.  See Berry, 604 F.2d at 227.

[8]     Frey advanced his Krivoi-based arguments in support of his Rule 29 motion for acquittal.  (ECF No. 170 at 4.)  Frey also seems to request, without explanation or analysis, a new trial given Krivoi. (See id.; ECF No. 162.)  To the extent Frey intended to also rely on Krivoi in his Rule 33 motion to argue insufficient evidence warrants a new trial, the Court denies that relief.  "[T]he 'preponderates heavily' standard does not warrant a new trial here" given the "wealth of evidence . . . detailed above" and further discussed below.  Landesman, 17 F.4th at 331; see, e.g., United States v. Napout, 332 F. Supp. 3d 533, 575 (E.D.N.Y. 2018) (rejecting Rule 29 arguments and weight of the evidence Rule 33 arguments for the same reasons), aff'd, 963 F.3d 163 (2d Cir. 2020).

1.     **The Jury Reasonably Determined that Frey Intended to Hold Danielle and Desira for an Appreciable Period**

Frey argues that the time in which Danielle and Desira were inside the Jeep "was both too brief in duration and distance to constitute kidnapping."  (ECF No. 173 at 1.)  That argument misconstrues the relevant convictions.  Frey was convicted of <u>Attempted</u> Kidnapping.  (<u>See</u> ECF No. 140 at 1-2.)  Frey's argument fails because he may be convicted of Attempted Kidnapping even if he "stopped short of . . . the actual commission of the substantive crime." <u>E.g.</u>, <u>Pugh</u>, 945 F.3d at 20 (quoting <u>United States v. Yousef</u>, 327 F.3d 56, 134 (2d Cir. 2003)); <u>accord</u> <u>United States v. Iribe</u>, 564 F.3d 1155, 1160 (9th Cir. 2009) (holding that an Attempted Kidnapping conviction "do[es] not require completion of the criminal objective" (internal quotation marks omitted)).

Frey advances a similar argument within the correct framework.  Frey contends that the government failed to prove that he <u>intended</u> to hold Danielle and Desira for an appreciable period. (<u>See</u> ECF No. 173 at 4); <u>see also</u> <u>Collier</u>, 989 F.3d at 221.  Whether a detention is appreciable concerns "not only the detention's length but also other aspects of the detention, such as the extent of the danger posed to the victim." <u>Krivoi</u>, 80 F.4th at 151 (citing <u>United States v. Rodriguez</u>, 587 F.3d 573, 581 (2d Cir. 2009)).  Even if short in duration, a detention may be appreciable when it involves threats of injury, actual violence, or forced travel.  <u>See</u> <u>id.</u>; <u>Rodriguez</u>, 587 F.3d at 581. The evidence showed that Frey's offense conduct involved all three circumstances.  Danielle's and Desira's testimony allowed the jury to conclude that Frey threatened to injure them.  (<u>See</u> Tr. 131-32 (testimony that Frey threatened to kill Danielle during their struggle); Tr. 395-96 (testimony that, when Desira asked to exit the Jeep, Frey <u>screamed</u> "I own you" such that Desira feared for her life).)  Their testimony also detailed Frey's violence.  Danielle and Desira reported how Frey physically struggled with them—while he drove—to force them to remain in his vehicle.  (<u>See</u> Tr. 131-35, 249-50, 261, 300 (Danielle's testimony); Tr. 393, 394-97, 476-77, 499-500 (Desira's

testimony).)  Finally, the testimony described how Frey tried to compel Danielle and Desira to travel to secluded locations.  (See Tr. 131-35, 249-50, 261, 300, 393, 394-97, 476-77, 499-500.) In fact, Frey now acknowledges that he "abduct[ed]" those women.  (ECF No. 173 at 3.)

Accordingly, the jury had ample evidence to conclude that Frey intended to detain Danielle and Desira for an appreciable period.  See Krivoi, 80 F.4th at 151 (finding a "short" detention was nonetheless "appreciable" because it involved death threats, violence, and travel to another location); United States v. Corbett, 750 F.3d 245, 252 (2d Cir. 2014) (affirming Kidnapping conviction because the evidence permitted the jury to conclude the defendant intended to lure the victim into a vehicle and hold the victim there against his will); United States v. Betancourt, No. 16-CR-238, 2019 WL 2720738, at *8 (D. Conn. June 28, 2019) (similar), aff'd, No. 19-3969-CR, 2021 WL 2026150 (2d Cir. May 21, 2021); accord Gov't of V.I. v. Ventura, 775 F.2d 92, 98-99 (3d Cir. 1985) (holding the defendant kidnapped his victim by "brutally pulling" her for just "a few minutes" to another location)[9]; cf. Rodriguez, 587 F.3d at 581 (finding fifteen-minute detention was not appreciable because it occurred absent violence or threats of violence while all involved parties waited for police to arrive).

### 2. The Evidence Established that Frey Intended to Hold Danielle and Desira Appreciably Longer Than Necessary to Commit Sex Trafficking

Frey contends that "[t]he fact that the women were inside of [the Jeep] was incidental to the overall crime" of Attempted Sex Trafficking such that Attempted Kidnapping "was not a separate offense" and the latter convictions must be dismissed under Krivoi.  (ECF No. 173 at 4;

---

[9]     The Second Circuit has relied on Ventura to analyze federal kidnapping notwithstanding that Ventura addressed kidnapping under Virgin Islands law.  See Krivoi, 80 F.4th at 154 (citing Ventura, 775 F.2d at 99).

see id. at 3 ("The abduction was part and parcel of the attempted commercial sex acts and was not committed with any secondary purpose.").)  The Court disagrees.

Under Krivoi, the government was required to prove that Frey intended to hold Danielle and Desira for a period "appreciably longer than the time required to commit the other offense," namely, Attempted Sex Trafficking.  80 F.4th at 154.  This inquiry looks at the entire period of detention—in this case, the intended detention, see Collier, 989 F.3d at 221; Howard, 918 F.2d at 1536—and "separates the kidnappings that defendants commit in addition to their other crimes from detentions that are merely necessary components of other crimes."  Krivoi, 80F.4th at 154.  "[T]his test should not be viewed as a simple comparison between the time needed to commit the kidnapping and the time needed to commit the separate offense."  Id.

Krivoi illustrates this principle.  There, the appellant asserted that the victim's detention was too brief to constitute kidnaping because it was incidental to the charged attempted extortion.[10] See id. at 149-50.  In that case, one defendant telephoned the victim and instructed him to go to a cafe, promising that they would just "talk."  Id. at 146.  Once the victim came to the cafe, the defendants (1) forced the victim to enter a truck and drove him to a nearby public park, (2) dragged the victim to a secluded area of the park, (3) demanded certain sums of money, (4) threatened the victim at knife point and punched him until he agreed to make monthly payments, (5) forced the victim back into the truck and drove him back to the cafe, and (6) put the victim in a "headlock" before instructing him to walk away without looking back.  Id. at 147-48.  Applying its new standard to those facts, the Second Circuit held that the defendants held the victim "for a period appreciably longer than what they would have required if they had only extorted him."  Id. at 154.

---

[10]     That argument concerns the second Kidnapping element, which, under Supreme Court precedent, requires that "the victim was detained for an 'appreciable' period."  Krivoi, 80F.4th at 150 (quoting Chatwin v. United States, 326 U.S. 455, 460 (1946)).

The Second Circuit reasoned that the attempted extortion "could have been accomplished in the course of one or more phone conversations" with the victim or "while meeting with him at Masal Cafe. Instead, through violence and threats of violence, [the defendants] held [the victim] under their control . . . ." Id. The Second Circuit concluded that the kidnapping "was intimately related to" the extortion but "kidnappings are typically designed to instill fear that will yield payment, so the fact that [the victim's] kidnapping was connected to his extortion does not transform the kidnapping into an incidental part of the extortion scheme. The kidnapping was a separate and additional crime—overlapping but not coterminous—that independently subjected Krivoi to criminal liability." Id.

As explained below, the detentions and asportations Frey intended to undertake after he completed his Sex Trafficking offenses establish that his Attempted Kidnapping convictions remain valid after Krivoi.

<div style="text-align:center">a.    <u>Frey Completed Each Attempted Sex Trafficking Before His Intended Asportations and Detentions of Danielle and Desira</u></div>

The Attempted Sex Trafficking convictions required that Frey took a substantial step toward and intended to, <u>see, e.g.</u>, <u>Collier</u>, 989 F.3d at 221, (1) knowingly recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit his victim; and (2) do so while knowing or recklessly disregarding that force, threats of force, fraud, coercion, or any combination of such means would be used to cause his victim to engage in a commercial sex act.[11] <u>See</u> 18 U.S.C. § 1591(a)(1); <u>Raniere</u>, 55 F.4th at 360; <u>United States v. Ray</u>, No. 20-CR-110, 2022 WL 17175799, at *6 (S.D.N.Y. Nov. 23, 2022). Thus, "[a] crime under § 1591 is 'complete when the defendant recruits, entices, harbors, etc., the victim with knowledge that the prohibited means

---

[11]     The statute also requires that the defendant's conduct occur in or affect interstate commerce. <u>See</u> 18 U.S.C. § 1591(a)(1). Frey's conduct satisfied that requirement. <u>See</u> <u>infra</u> Section III.C.

<div style="text-align:center">16</div>

will be used in the future to cause them to engage in commercial sex acts.'" <u>United States v.</u> <u>Taylor</u>, 44 F.4th 779, 790 (8th Cir. 2022) (quoting <u>Maynes</u>, 880 F.3d at 114).  To be sure, Sex Trafficking "requires only that the defendant know that the victim will be caused to engage in a commercial sex act; the statute does not require that an actual commercial sex act have occurred." <u>United States v. Corley</u>, 679 Fed. App'x 1, 7 (2d Cir. 2017) (first citing <u>United States v.</u> <u>Hornbuckle</u>, 784 F.3d 549, 553-54 (9th Cir 2015); and then citing <u>United States v. Garcia-</u> <u>Gonzalez</u>, 714 F.3d 306, 312 (5th Cir. 2013)); <u>see, e.g.</u>, <u>United States v. Alvarez</u>, 601 F. App'x 16, 18 (2d Cir. 2015).  Thus, "the expansive language of § 1591 criminalizes a broad spectrum of conduct . . . ." <u>Taylor</u>, 44 F.4th at 788 (internal quotation marks omitted); <u>accord</u> <u>United States v.</u> <u>Estrada-Tepal</u>, 57 F. Supp. 3d 164, 168-69 (E.D.N.Y. 2014).

Viewing the evidence most favorably to the government, Frey satisfied the elements of Sex Trafficking when he recruited and solicited Danielle in October 2018 for commercial sex.  <u>See</u> <u>Ardolf</u>, 332 F.R.D. at 474 (holding that "recruit" in § 1591 means "the perpetrator somehow secured the services of the victims" (internal quotation marks omitted)); Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, §§ 108-09, 129 Stat. 227, 238-39 (amending § 1591(a)(1) to include "solicits or patronizes" a victim to clarify that the statute applies to those "who purchase sexual acts").  At that point, Frey obtained Danielle's consent to meet for commercial sex through fraud: the false promise to not take Danielle to the beach for sex.  (Tr. 128-31, 190, 248-49, 300).  Frey's "failure to perform" that promise "suggests that he *knew* his 'promise[] had no factual basis'"—and was therefore fraudulent—when he communicated it to Danielle.  <u>David</u>, 431 F. Supp. 3d at 302 (quoting <u>Noble v. Weinstein</u>, 335 F. Supp. 3d 504, 518-19 (S.D.N.Y. 2018)); <u>see</u> <u>Ardolf</u>, 332 F.R.D. at 475-477 (holding that a false promise material to and reasonably relied upon for inducing commercial sex constitutes fraud); <u>accord</u> <u>Taylor</u>, 44 F.4th

at 790 (finding defendant's lie to a masseuse about customers' expectations for commercial sex acts constituted fraud).

Similarly, viewing the evidence most favorably to the government, Frey satisfied the elements of Sex Trafficking when he recruited and solicited Desira in July 2019 for commercial sex. At that point, Frey knew that he would use force, threats of force, and coercion to obtain commercial sex. Critically, the Sex Trafficking statute "does not require knowledge in the sense of certainty as to a future act." Hornbuckle, 784 F.3d at 554 (internal quotation marks omitted). Instead, the statute requires only "that the defendant know in the sense of being aware of an established modus operandi that will in the future coerce a prostitute to engage in prostitution." Purcell, 967 F.3d at 193 (quoting United States v. Todd, 627 F.3d 329, 334 (9th Cir. 2010)). Thus, the requisite knowledge "brings the predictable," but not necessarily certain, "use of force, fraud, or coercion into the definition of the defendant's crime." Todd, 627 F.3d at 334. Accordingly, Frey's prior use of force, threats of force, and coercion to compel Danielle to a particular location for commercial sex, see supra Sections I.B, III.A, allowed the jury to "conclude that [Frey] knew he would follow the same pattern" with Desira. Todd, 627 F.3d at 334 ("[J]ust as a judge knows that his law clerks will use Westlaw, so Jerome Todd knew that he would use coercion to cause his sex workers to make money for him."); accord Purcell, 967 F.3d at 193-94 (concluding the defendant acted with knowledge under § 1591(a) because his "pattern of behavior" and "experience" in "the commercial sex industry" reflected a modus operandi of coercing women to engage in commercial sex); see also David, 431 F. Supp. 3d at 301 (concluding the modus operandi of coercing actresses to engage in commercial sex established knowledge under § 1591(a)).

Moreover, Frey certainly committed the Attempted Sex Trafficking offenses no later than the commencement of each struggle in the Jeep.  At each such point, Frey was transporting each woman for commercial sex and used force, threats of force, and/or coercion to obtain that sex.  See supra Sections I.B, III.A; see also Purcell, 967 F.3d at 190 (explaining that a defendant transports a person when he "perform[s]" the transporting "as opposed to situations where the victim travels under her own steam, without need of anyone to transport her" (internal quotation marks omitted)).

        b.    Frey Intended to Hold Danielle and Desira for an Appreciable Period After his Attempted Sex Trafficking of Each Woman

The evidence viewed most favorably to the government showed that Frey undertook his violent, threatening, and coercive attempted asportations of Danielle and Desira to his desired locations—which for Danielle would have taken approximately twenty minutes,[12] (see Tr. 122, 219-21)—to then hold them for the duration of a compelled sexual encounter.  See supra Parts I.B, III.A.  If he had succeeded in doing so, Frey would have completed Sex Trafficking much earlier, when, as explained above, "*he acted with the requisite knowledge*" for Sex Trafficking.  Hornbuckle, 784 F.3d at 554 (quoting United States v. Willoughby, 742 F.3d 229, 241 (6th Cir. 2014), abrogated on other grounds by Johnson v. United States, 576 U.S. 591 (2015)); accord Estrada-Tepal, 57 F. Supp. 3d at 169.  Indeed, the Sex Trafficking would have been complete when he first recruited and solicited (and certainly no later than when he began to forcibly transport) Danielle and Desira knowing that he would use force, threats of force, fraud, and/or coercion to obtain commercial sex from them.  See supra Section III.B.2.a; see also Hornbuckle, 784 F.3d at 554 (explaining that Sex Trafficking may be completed before a single "moment of penetration"

---

[12]      The record does not specify how long it would have taken Frey to transport Desira to his chosen location in the woods for sex after she objected to going there.  But even a "short" continuation of Frey's conduct in that asportation would have been appreciable.  Krivoi, 80 F.4th at 151; see Ventura, 775 F.2d at 98-99.

(quoting Willoughby, 742 F.3d at 241) (emphasis removed)); accord Corley, 679 Fed. App'x at 7;

Alvarez, 601 F. App'x at 18.  Thus, Frey's intended asportations of those women to predetermined

locations and his intended detentions of the women at those locations for the duration of compelled

sex would have been "appreciably longer than the time [Frey] needed to commit only the other

crime or crimes with which he . . . has been charged," namely, Sex Trafficking those women.

Krivoi, 80 F.4th at 154.

United States v. Peden, 961 F.2d 517 (5th Cir. 1992), which Krivoi favorably quotes, see

80 F.4th at 153, supports the Court's conclusion that Frey's Attempted Kidnapping convictions

must be sustained.  In Peden, the defendant promised to drive a young girl from a skating rink to

a Wendy's; instead, he drove her to a wooded area and raped her.  See 961 F.2d at 519.  On appeal,

the defendant sought to reverse his Kidnapping conviction by arguing that it was predicated on the

holding inherent in the rape underlying his convictions for Sexual Abuse and Sexual Abuse of a

Minor.  See id. at 522.  The Fifth Circuit rejected that argument because the victim was aware the

defendant "was not taking her to Wendy's for some time prior to the actual rape."  Id.  The Fifth

Circuit also reasoned that "asportation and detention went beyond that necessarily inherent in rape"

because the defendant took his victim to the woods for the rape instead of committing it at the

skating rink.  Id.  Similarly here, if Frey had completed his objective, Danielle and Desira would

have been aware Frey "was not taking her to [an agreeable location] for some time prior to the

actual rape."  Id.  And even if the occurrence of commercial sex under force, threats of force, fraud,

or coercion was a required element of the charged Attempted Sex Trafficking, contra Corley, 679

Fed. App'x at 7, Frey's intended conduct still would have extended "beyond that necessarily

inherent in" such sex because Frey would have first subjected his victims to compelled asportation.

Peden, 961 F.2d at 522; accord Ventura, 775 F.2d at 98-99 (affirming Kidnapping conviction

because the defendant "brutally pull[ed]" the victim, for just "a few minutes," to a house before raping her there); United States v. English, No. 18-CR-492, 2020 WL 7773606, at *16-17 (S.D.N.Y. Dec. 30, 2020) (concluding the victim's detention supported Kidnapping and was not incidental to her rape because she was held before (and after) the rape), aff'd, No. 21-471, 2022 WL 5237471 (2d Cir. Oct. 6, 2022); see also Krivoi, (affirming Kidnapping as supported by detention appreciably longer than needed for the related extortion because the extortion "could have been accomplished" with less detention or no detention at all).

Finally, as Krivoi explained, "kidnappings are typically designed to instill fear that will yield" something of value to the kidnapper, which in this case would be sex. 80 F.4th at 154. For that reason, the connection between the attempted conduct underlying Frey's convictions "does not transform the kidnapping into an incidental part of the [sex trafficking] scheme. The kidnapping was a separate and additional crime—overlapping but not coterminous—that independently subjected [Frey] to criminal liability." Id.

      c.     <u>Sustaining Frey's Attempted Kidnapping Convictions is Consistent with the Concerns Animating Krivoi</u>

Sustaining Frey's Attempted Kidnapping convictions comports with the concerns and goals of Krivoi and related cases concerning the breadth of kidnapping. "[T]he Supreme Court instructed that notwithstanding 'the broad language of' the federal kidnapping statute, courts must eschew 'loose constructions of the statutory language that conceivably could lead to' absurd results and unfair punishments." Krivoi, 80 F.4th at 153 (quoting Chatwin, 326 U.S. at 464-65) (brackets omitted). Thus, "[c]ourts must always be careful to avoid convicting a defendant for a crime which is in effect a necessary element of another crime for which the defendant has also been convicted." Id. (quoting Peden, 961 F.2d at 522-23). Courts also seek to avoid more general "'overzealous enforcement' of the federal kidnapping statute." Id. (quoting Berry, 604 F.2d at 266). "The

21

principal danger of overzealous enforcement of kidnapping statutes is that persons who have committed such substantive crimes as robbery or assault which inherently involve the temporary detention or seizure of the victim will suffer the far greater penalties prescribed by the kidnapping statutes." Berry, 604 F.2d at 266 (emphasis added); see, e.g., Ferguson, 65 F.4th at 812, 815; United States v. Jackson, 24 F.4th 1308, 1314 (9th Cir. 2022).

Those concerns are not implicated here. As explained above, the intended detentions underlying Frey's Attempted Kidnapping convictions extend beyond—and are not elements of—his Attempted Sex Trafficking convictions. Moreover, the evidence at trial made clear that the detentions at issue cannot be considered "incidental." Krivoi, 80 F.4th at 154. For example, Frey attempted to detain Danielle and force her to travel to, and engage in sex at, a beach that was approximately 20 minutes away from the train station where Frey picked her up. Such prolonged detention and asportation would undoubtedly constitute an independent kidnapping; it would not be comparable to the "incident[al]" detentions that "necessarily" occur during the commission of other crimes, such as robbery or assault. Berry, 604 F.2d at 228; see, e.g., Jackson, 24 F.4th at 1314 (reversing Kidnapping conviction because "[t]he primary conduct here was an assault[,] . . . which inherently requires the defendant to keep the victim in close enough proximity to inflict the injuries"); Ferguson, 65 F.4th at 815 (reversing Attempted Kidnapping conviction because the evidence did not show that the defendant intended to hold his victims beyond that inherent in his planned robbery); Howard, 918 F.2d at 1537 (similar).

Finally, the Court notes that the penalties for Attempted Kidnapping convictions do not far exceed the penalties for Attempted Sex Trafficking convictions. In fact, the penalties for an Attempted Sex Trafficking conviction—which include a 15-year mandatory minimum sentence—are significantly harsher than the penalties for Attempted Kidnapping. Compare §§ 1591(b)(1),

1594(a) (providing that Attempted Sex Trafficking by means of force, threats of force, fraud, or coercion requires incarceration for fifteen years to life), with § 1201(d) (providing a maximum twenty-year sentence for Attempted Kidnapping).

**C.    The Evidence Demonstrated a Sufficient Nexus to Interstate Commerce**

The convictions in this case require proof that Frey's conduct (among other things) occurred in or affected interstate commerce.  See §§ 1201(a)(1), 1591(a)(1).  Frey contends the evidence failed to satisfy these elements of his convictions.  (See ECF No. 156-1 at 15.)  That argument lacks merit.  The Kidnapping statute requires "only a de minimis effect on interstate commerce."  United States v. Garrett, No. 17-59, 2022 WL 2979588, at *3 (2d Cir. July 28, 2022) (citing United States v. Celaj, 649 F.3d 162, 168 (2d Cir. 2011)); accord Todd, 627 F.3d at 333 (describing broad breadth of the Commerce Clause's applicability under § 1591).  Likewise, "the burden of proving a nexus to interstate commerce is minimal" under the Sex Trafficking statute.  United States v. Shine, No. 20-314, 2022 WL 761520, at *2 (2d Cir. Mar. 14, 2022) (quoting United States v. Elias, 285 F.3d 183, 188 (2d Cir. 2002)).

Frey's use of his cell phone to meet Danielle and Desira for the instant crimes had a sufficient impact on interstate commerce.  See United States v. English, No. 21-471, 2022 WL 5237471, at *2 (2d Cir. Oct. 6, 2022), cert. denied, 143 S. Ct. 837 (2023); Garrett, 2022 WL 2979588, at *3; Shine, 2022 WL 761520, at *2; accord United States v. Koech, 992 F.3d 686, 693 (8th Cir. 2021); United States v. Evans, 476 F.3d 1176, 1180-81 (11th Cir. 2007).  Frey's use of the Jeep, an instrumentality of interstate commerce manufactured out of state (see Tr. 379-82), to commit the instant crimes also sufficiently affected interstate commerce.  See United States v. Graham, 707 F. App'x 23, 26 (2d Cir. 2017); United States v. Smith, 743 F. App'x 606, 610 (6th Cir. 2018); see also United States v. Morgan, 748 F.3d 1024, 1032 n.7 (10th Cir. 2014) (noting that

congressional power to regulate instrumentalities of interstate commerce, like automobiles, "includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature" (quoting United States v. Ballinger, 395 F.3d 1218, 1226 (11th Cir. 2005) (en banc))).

### D.   The Court Will not Grant a New Trial

Frey contends that he must be granted a new trial on based on an impermissible variance and separate occurrences of alleged manifest injustice.  (See generally, ECF No. 156-1.)  The Court disagrees.

#### 1.   There Was No Improper Variance

Frey argues for a new trial based on a purportedly improper variance.  To that end, Frey contends that the trial evidence showed he "used force, threats of force, fraud or coercion in an attempt to torture and murder" Danielle and Desira instead of "to engage in" or "hold them to obtain" commercial sex.  (ECF No. 156-1 at 17 (emphasis added); see id. at 17-26.)  To obtain the relief he seeks, Frey must show that a variance occurred at trial and that it resulted in "substantial prejudice."  United States v. Khalupsky, 5 F.4th 279, 294 (2d Cir. 2021) (quoting United States v. Dove, 884 F.3d 138, 149 (2d Cir. 2018)).  Frey fails to make either showing.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment."  Id. (quoting Dove, 884 F.3d at 149).  Frey's argument that a variance occurred is patently absurd and may be quickly dispatched.  As explained above, the evidence showed Frey intended to use force, threats of force, and coercion to hold Danielle and Desira and make them engage in commercial sex—regardless of Danielle's and Desira's fear that Frey might ultimately kill them—as alleged in the Superseding Indictment.  See supra Sections III.A, III.B.  Therefore, no variance occurred.

See, e.g., Khalupsky, 5 F.4th at 294 (finding no variance because evidence did not materially differ from the superseding indictment's allegations).

Even if Danielle's and Desira's reported fear that Frey might ultimately kill them constituted a variance, Frey fails to demonstrate prejudice.  "A variance raises constitutional concerns only if it deprives a defendant of the notice and double jeopardy protections of an indictment."  United States v. Lee, 833 F.3d 56, 71 (2d Cir. 2016) (quoting United States v. Agrawal, 726 F.3d 235, 260 (2d Cir. 2013)).  Insufficient prejudice therefore lies "where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense."  Khalupsky, 5 F.4th at 294 (quoting United States v. Salmonese, 352 F.3d 608, 621-22 (2d Cir. 2003)).  Taken together, those principles require the defendant to have "notice of the core of criminality to be proven at trial."  Lee, 833 F.3d at 71 (quoting United States v. Kaplan, 490 F.3d 110, 129 (2d Cir. 2007)).  "[T]he 'core of criminality' is 'the essence of a crime, in general terms . . . .'"  Agrawal, 726 F.3d at 260 (quoting United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012)).

The Superseding Indictment notified Frey of the essence of the Attempted Sex Trafficking and Attempted Kidnapping crimes proven at trial.  (See supra Part I.)  As a result, the government was "permitted significant flexibility in proof without finding prejudice" from a variance.  Lee, 833 F.3d at 71 (quoting Kaplan, 490 F.3d at 129) (emphasis added).  Moreover, Frey's failure to object to or request a continuance in response to Danielle's and Desira's reported fear that he might ultimately kill them suggests that testimony did not cause substantial prejudice.  See Kaplan, 490 F.3d at 130; United States v. Maxwell, No. 20-CR-330, 2022 WL 1294433, at *16 (S.D.N.Y. Apr. 29, 2022).  At bottom, any prejudice from that testimony was reduced by defense counsel's

(1) awareness that Danielle and Desira would testify about the events described in the Superseding Indictment, (2) cross-examination of those women about that testimony, and (3) summation about that testimony.  (See, e.g., Tr. 396, 739); Dove, 884 F.3d at 143, 150 (finding no prejudice from variance because the defendant could not have been "surprised" by the government's largely testimonial evidence at trial); United States v. Spoor, 904 F.3d 141, 153 (2d Cir. 2018) (concluding alleged variance was not prejudicial because (among other things) defense counsel cross-examined witnesses on the alleged variance and argued about it in summation); United States v. Stitsky, 536 F. App'x 98, 103 (2d Cir. 2013) (finding alleged testimonial variance was not prejudicial because defendants were on notice of it).

Thus, Danielle's and Desira's reported fear that Frey might ultimately kill them is not a substantially prejudicial variance sufficient to disturb the jury's eminently reasonable conclusion that Frey intended to use force, threats of force, fraud, and/or coercion to hold Danielle and Desira and obtain commercial sex from them—as alleged in the Superseding Indictment.  See supra Part I (describing the Superseding Indictment and trial); supra Sections III.A, III.B (concluding the evidence supported the jury's finding that Frey acted with the requisite intent for his convictions).

## 2. The Apparent "Gilgo Beach Serial Killer" Similarities do not Present a Manifest Injustice

Frey asserts that his convictions present a manifest injustice requiring a new trial because the testimony depicted him like the "Gilgo Beach Serial Killer" who reportedly murdered sex workers and buried them on a Long Island beach.  (ECF No. 156-1 at 27); see generally Meredith Deliso, *Gilgo Beach Murders: A Timeline of the Investigation*, ABC NEWS, https://abcnews.go.com/US/gilgo-beach-murders-timeline-investigation/story?id=101428812 (Aug. 4, 2023, 11:23 AM); see also Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 425 (2d Cir. 2008) (permitting judicial notice of news reports without regard to the truth of their contents).

26

This argument fails as a matter of fact and law.  As a matter of fact, Frey acknowledges that "the government's evidence did not specifically invoke the 'Gilgo Beach Serial Killer.'"  (ECF No. 156-1 at 27.)  As a matter of law, the Court instructed the jury to consider only the evidence admitted at trial.  (See Tr. 783-84, 814-15, 819).  "It is an 'almost invariable assumption of the law that jurors follow their instructions,' and [Frey] offers no persuasive reason to suspect that the jurors here did otherwise."  United States v. Rasheed, 981 F.3d 187, 196 (2d Cir. 2020) (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)); see Samia v. United States, 143 S. Ct. 2004, 2013 (2023) ("[O]ur legal system presumes that jurors will 'attend closely the particular language of [jury] instructions in a criminal case and strive to understand, make sense of, and follow' them." (quoting United States v. Olano, 507 U.S. 725, 740 (1993))).

### 3.     Evidence Regarding Items Recovered from the Jeep did not Present a Manifest Injustice

Frey seeks a new trial based on the government's allegedly improper introduction of evidence about items recovered from the Jeep.  (ECF No. 156-1 at 27-28; see supra Section I.B.3 (explaining that, among other things, gloves with reinforced knuckles, a rope attached to a carabiner, a dog collar attached to a leash, and a machete knife were recovered from the Jeep).)  The Court already ruled before trial that (1) these items would be admissible as relevant to Frey's intent to use force for the Attempted Sex Trafficking charges and intent to hold for the Attempted Kidnapping charges, and (2) Frey's objections went to the weight that this evidence should be afforded, which is the province of the jury.  (See ECF No. 160-1 at 80-86); Pugh, 945 F.3d at 20 (holding that the jury for an attempt charge may consider efforts taken toward the substantive crime); United States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (describing the "very low standard" for relevance and confirming relevant evidence is generally admissible (internal quotation marks omitted)); United States v. Miller, 626 F.3d 682, 693 (2d Cir. 2010) ("The weight

27

to give evidence . . . is a question for the jury and has no bearing on the threshold relevance determination under Rule 401.").  The Court rejects Frey's renewed objections to this evidence and reaffirms the pretrial ruling that allowed the government to introduce this evidence.

Relatedly, Frey seeks a new trial because FBI Special Agent Buonocore testified that she remembered the search of the Jeep because it was the first time she recovered a human collar and leash from a vehicle, the machete was mounted in the Jeep in a manner she did not "normally see," and the recovered items "both individually and as a collected group, left a disturbing image in [her] mind."  (ECF No. 156-1 at 28 (quoting Tr. 49-51, 71, 73).)  Special Agent Buonocore's memory of the Jeep search meets the "very low standard" of relevance.  White, 692 F.3d at 246 (internal quotation marks omitted); (see Tr. 49-51, 71, 73).  The probative value of that testimony was not substantially outweighed by its prejudice given the need to authenticate the items recovered from the Jeep.  See FED. R. EVID. 403, 901(a), 901(b)(1); United States v. Gelzer, 50 F.3d 1133, 1141 (2d Cir. 1995) (concluding that a firearm was properly authenticated at trial based on law enforcement testimony about its recovery and chain of custody).

Ultimately, relief under Rule 33 is only appropriate when the defendant shows "there is a real concern that an innocent person may have been convicted."  Hunter, 32 F.4th at 30 (quoting McCourty, 562 F.3d at 475).  Frey does not meet that burden.  His evidentiary objections concerning the items recovered from the Jeep do not present the "extraordinary circumstances" under which the Court may exercise its discretion to grant a new trial out of concern that an innocent person may have been convicted.  Escalera, 957 F.3d at 137 (quoting Torres, 128 F.3d at 48); see Landesman, 17 F.4th at 330.  Put differently, "[e]ven assuming arguendo there was error, it would be harmless" given the "strength of the government's case" without the evidence of the items recovered from the Jeep and Special Agent Buonocore's challenged testimony.  United States

v. Delgado, 971 F.3d 144, 154 (2d Cir. 2020) (addressing admission of AR-15 rifle); see United States v. McCallum, 584 F.3d 471, 478 (2d Cir. 2009) (finding admission of evidence constituted harmless error where the government's case was otherwise "indisputably strong"); supra Sections I.B, III.A, III.B, III.C (summarizing trial evidence and rejecting sufficiency-of-evidence challenges to Frey's convictions).

### 4.    The Government's Summation did not Deprive Frey of a Fair Trial

Finally, Frey objects to the prosecution's summation insofar as it referenced the materials recovered from the Jeep, noted that Frey's phone contained Desira's address, described the testimony from Frey's daughter, and stated that the evidence showed Frey went "from a happy-go-lucky john to a raging madman who presented more of a threat to [Danielle and Desira] than jumping from a moving Jeep." (ECF No. 156-1 at 28-29 (quoting Tr. 686; citing Tr. 680, 682).) "A defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." United States v. Willis, 14 F.4th 170, 186 (2d Cir. 2021) (quoting United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2012)). The Court "must consider the objectionable remarks within the context of the entire trial." Banki, 685 F.3d at 120 (quoting United States v. Espinal, 981 F.2d 664, 666 (2d Cir. 1992)). In addition, "the Government has broad latitude in the inferences it may reasonably suggest to the jury during summation," United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (internal quotation marks omitted), and "courts will not lightly infer that every remark is intended to carry its most dangerous meaning." United States v. Aquart, 912 F.3d 1, 27 (2d Cir. 2018) (quoting Farhane, 634 F.3d at 167).

To determine whether a prosecutor's remarks deprived a defendant of a fair trial, courts "look to the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct."  Willis, 14 F.4th at 186-87 (quoting United States v. Caracappa, 614 F.3d 30, 41 (2d Cir. 2010)).  Upon applying those factors, the Court concludes Frey has "not demonstrated that any of the[] remarks" were improper, let alone "sufficiently improper to have denied [hi]m a fair trial.  In other words, this is not the 'rare case in which alleged improper comments in a prosecutor's summation are so prejudicial that a new trial is required.'"  Id. at 187 (quoting United States v. Rodriguez, 968 F.2d 130, 142 (2d Cir. 1992)) (internal brackets omitted); see Aquart, 912 F.3d at 29 (similar).

## IV.    CONCLUSION

For the reasons stated above, Frey's motion for acquittal or a new trial is DENIED.  The Court declines to grant Frey relief from his convictions.

**SO ORDERED.**

Dated:    June 4, 2024
          Central Islip, New York

                              _____(/s/ JMA)_____
                              JOAN M. AZRACK
                              UNITED STATES DISTRICT JUDGE